Appellant. Good morning, Your Honor. I'm Stephen LaCarre, and I'm going to argue on the issue primarily of necessity and the fair and whole of France here, and I've asked for three minutes of rebuttal. Essentially, Your Honor, our position, and I want to focus on the March 11th, 2011 wiretap extension. The reason I want to focus on that is essentially the vast majority of the government's evidence dealing with the storage shed was revealed as a result of that wiretap extension application. Our position is that the government has told you that the reason the agents sought to extend the wiretap on March 11th was because they were looking to find the suppliers. The problem with the application is that they had been overhearing communications on target telephone number two. That was the subject of a wiretap application for two months. And not once, not once, had any reference come across the intercepts as to supply. So there was no reasonable basis for them to believe that a continuation of the T22 wiretap was going to pick up any indicia of supply-side transactions. Beyond that, they had a pretty good idea who the supplier was. They recognized that it was Mr. Edwards. And how do we know that? Because we know that when they, in March 19th, when they sought to do a wiretap on TT3, a different telephone, they disclosed the existence of a confidential source, CS4, who they had worked with for ten years, and who knew Mr. Edwards, Mr. Richards, Mr. Moore, and Mr. Bowman, and had given the government information that was not disclosed. It wasn't disclosed on March 11th about the nature of the conspiracy that the government was investigating. Is this the way you argued it in your brief? I don't recall you arguing in your brief that the March 11th extension wasn't needed because it was going to be a few. No, our argument as to March 11th, Your Honor, was this. Not that it would be a few. Well, the government brought up supply-side in its opposition brief, and we dealt with supply in our rebuttal. What we said in our opening brief was that there was no necessity, no necessity to do a continued wiretap on March 11th for the reason that the agents, which they'd had a They'd picked up an enormous amount of information at that point, and subsent hundreds of hours of communications that they'd intercepted. That seems to be a different argument than you're making now. I mean, it's one thing to say that you don't need the wiretap because you can find information through other investigative techniques. Now it seems like you're making an argument that they didn't need the wiretap because it wasn't going to show anything because it hadn't shown anything in the time that it That's partially correct, Your Honor. I'm addressing the government's position that they articulated in their opposition brief that the reason they wanted, and I said this in our reply brief, that they wanted the extension on TT2 to deal with the supply-side issue. So what we said in our reply brief was there was no indication on TT2 that they were going to pick up any supply-side transactions. That wasn't, in fact, supply-side was only mentioned twice in passing in the application to extend the wiretap on March 11th. That's in the Troyan Appendix 380 and 394. I'm dealing with an argument here that the government raised in its opposition because I think it's a powerful point to recognize there was no basis to believe after two months of continued wiretapping on TT2 that they were going to pick up any supply-side transactions. In fact, they had been following Mr. Edwards, who they suspected was the supplier, for two months. Agent Bevington had been following him since January. In addition to that, they had been doing visual surveillance photographs of Mr. Edwards and Mr. Bowman and Mr. Edwards' sister's residence and Mr. Bowman's residence. They did an ELSA electronic surveillance application on March 9th. So they knew who Giza Redmond was, and they recognized his role. But to say that they were seeking an extension of the wiretap to pick up the supply-side just isn't consistent with what we believe the facts to be. And insofar as the retail side, the argument that the government raised essentially is we want to know everything. But you always want to know everything with a traumatic intrusion like a wiretap so it can help you know everything. The question is, was it truly necessary at that point? Because when Title III was enacted, what Congress was trying to do was to say, yes, if you make a short-term necessity, you can wiretap it. You don't just get to wiretap willy-nilly. You've got to convince the judge, the issuing judge, that there is truly necessity. And that applies at the beginning and at every step that you seek an extension of the wiretap. Here, on March 11th, they picked up, they had hundreds of hours of communications. They have not identified anybody new, anybody new that they picked up after March 11th. They didn't know of well before and as to whom they hadn't accumulated literally hundreds of hours of intercepts. What should we make of the fact that, I guess, on the TT2 extension on March 11th and then the TT3 application that came later, that they named different people? On the TT3 application, some people dropped off. Other people were added. I mean, doesn't that show that they were trying to be careful about who they were naming and who they weren't? Well, the problem with these is the judge called to tell it did not allow a criteria in this issue. We could have found out essentially, and one was requested, who they knew and when they knew what they believed these people were up to. We have identified in our reply brief, and I'm referring to pages 18 to 20, that we knew the government admits in its opposition as to 11 people, but they knew at that point. They haven't said everybody they knew, but all indications, Judge Wilkins, are that they knew everybody that they were really focusing on. The fact that they added additional people, that doesn't mean they didn't know them before. I think more first officers on March 19th, if I'm correct, and more they knew about back in January. They were surveilling him. The fact that they didn't necessarily state every single person on March 19th, but we don't know because there's been no access to their investigatory files as to who they knew and when they knew it. All we can work with, because there was no facts here, although one was requested, was what have they told us? Who have they identified that they knew? That much is pretty clear. There are 11 people that they've identified that they knew as of March 11th. They knew they had no difficulty following people, although they claimed that there was a need to avoid furtiveness. There was nothing like that here. Most importantly, they have confidential source number four, whose all intents and purposes appear to have been highly placed and to have had intimate knowledge of the operation. I see I'm eating into my time, so with that I will reserve the rest of my time. Fine, thank you. Unless the court has any questions. Good morning. May it please the court, Nick Coleman for the United States. I'd like to begin by addressing the last point that the counsel made about CS4, because I do want to clear up some confusion. As Agent Park made clear when he described to the district court what CS4 had provided, CS4 was a person, a paid informant who had worked for the government for a long time, who had known some of these people, Edwards, Bowman, Richards, had seen them in the neighborhood, was aware of their past and believed in what he observed that they were engaged in drug trafficking. He was not, however, a highly placed source. He was not a part of the organization. He did not have access to that kind of information. As Agent Park stated in his affidavit, because of CS4's relationship with these people, he was not in a position even to try to purchase drugs. In other words, for whatever reason, his relationship was not one, and obviously I can't discuss the particulars of who he was or who she was, but this person basically did not have that kind of access. So I do want to clear that up for the record. I'd like to begin, however, by addressing the main point that I think counsel is making here about the March 11th extension, which appears to be that it was that the TT2 was no longer needed because at that point the government was only looking for the source of supply, and somehow the TT2 line had nothing to do with the source of supply. That's simply not correct. During the conversations that Mr. Bowman had over TT2 with his various retail distributors in Washington, D.C., he would repeatedly refer to when shipments were coming in. He would also talk about how he could go to his man or to various people to try to get drugs for these various distributors when the initial supply was done. So there were a lot of references to supply, and in fact, if you look at the TT3 application, Agent Park made clear that part of the reason why the government wanted to wiretap TT3 was because the timing of the calls that Mr. Bowman had been making over TT3, when compared to the intercepted communications on TT2, strongly suggested that Mr. Bowman was using TT3 to contact his source of supply, who was believed at that point to be Edwards. So again, it's simply not the case that TT2 was now unnecessary. Besides the government, why did the government... I mean, what's the rhyme or reason to kind of why the government named certain individuals in the March 11th extension and different individuals in the TT3 application? Well, again, the government is required by statute to name the persons as to which the government has probably possibly either involved in the enterprise and that they believe that their communications will be intercepted over that line. So that was the policy that the government was following at that time. I would point out, as we made clear in the brief, the government has, since this investigation concluded, has changed its practice. So now in a wiretap application, the government will name all persons believed to be a part of the organization because they might show up on the line, even if they don't expect that they will be using that particular telephone line. And certainly, as of March, when the TT2 extension was applied for, at that point, and the panelists can see this, there had not been a single recorded call at that point between Bowman and Edwards over the TT2 line. So they didn't have any reason to believe that Edwards would be heard communicating over TT2 at that point. But after the extension, Edwards was heard on that line? Yes, he was heard at some point after the final extension. So obviously, if there had been a re-extension at that point, they would have named him. But that doesn't render the March. Obviously, unexpected things can happen. But at that point, the government certainly had a lot of pen-registered data, and that's a point I'd like to turn to in just a second. They had a lot of pen-registered data over the course of months and had not, over those course of months, seen any communications over the TT2 line between Bowman and Edwards specifically. Another point that I think needs to be made is that the March TT2 reauthorization, it was necessary not simply as part of the ongoing efforts to find out the source of supply, but also to try to figure out the full network of Mr. Bowman's retail distributors throughout Washington, D.C. I think one of the important things to note is that there were an awful lot of transactions that were discovered between Bowman and his distributors, including between Bowman and Williams, after that application went through. The March 21st transactions involving Williams and Bowman would not have been discovered without the TT2 line because that was what tipped off the investigators that they were going to be meeting, not as one of the number of people who would be meeting with Mr. Bowman that day. Mr. Bowman, if you can help me out. Reading a lot of the agents' affidavits do read somewhat as boilerplate, and knowing as we do that Congress is very concerned about keeping limits on this highly intrusive form of surveillance, and following the logic of your argument that it's much more revealing, it's helpful, it seems like in every case law enforcement could say, well, we can't through traditional investigative methods get all the information we need. And I guess what I'm asking you is what can you assure us remains in terms of limitation on this mechanism if we approve a wiretap or sustain approval of a wiretap based on these affidavits? What narrows this? What makes this really stand out? I think as the judge found in this case in addressing this very concern as to whether or not, you know, the fact that the same thing that Agent Plotk was saying in the affidavits here has also been said in connection with other investigations. As the district judge said, that doesn't mean that they aren't true with respect to this investigation. And I think one of the important things to note is that the statute is very clear as to what kind of crimes can be investigated this way. These are, it is very clear that there has to be a pretty high-level interdepartmental review of any wiretap application even before it goes to a district judge. So there has to be quite a bit of investigative legwork. There has to be a determination as to why it's necessary, what it's going to achieve with respect to this investigation. And I think what is true is that by the time a wiretap application goes before a judge and the judge approves it, it is, in almost every case, it's going to be the kind of criminal enterprise and the kind of investigation that is going to require a wiretap. It's simply, you know, the small-time criminal operation involving only a couple of people, sure, that's probably not going to require a wiretap. And the government isn't going to seek a wiretap in those kind of cases. You know, these are enormously expensive and time-consuming operations. They aren't easy to carry out. And so it's not the case that the government is just going to willy-nilly. It's really not under this statute. Is there any such thing as a small-time drug operation? And given that there are people in the position of basically retail, like Mr. Williams in this case, you know, they're connected to something big always. So I'm not sure, well, at least in the drug world, if that really is much of a limitation. Well, I think it is in this case. By the time the government is going to go forward and get a wiretap, they're not just going to be looking at one street-level dealer or even just that street-level dealer and their immediate distributor. They're going to have an indication, as in this case, as in other cases like Elon and others, that this is a pretty wide-ranging network. In other words, this isn't just a couple of people running drugs and selling on their own. This is a pretty big network. And that's exactly what was at issue in this case. And why not, for example, GPS technology and traditional surveillance to follow a car to a warehouse? Right. I think, first of all, GPS technology can show you when a person's car is moving. But, for example, Mr. Bowman very frequently accessed the storage unit by taking the cab. He was pretty careful about that. In fact, it's interesting when you read through the evidence how many times this organization used taxi cabs. And then there's the GPS capability on the very phones that are being tapped. Is there a way for the government to just follow location information without following the voice data? Cell site data can give you, depending on where the person is, can give you some indication of what location they're at. But it's not perfect. It's not pinpoint. And the ability to necessarily figure out from somebody's cell phone exactly where they're going, it isn't quite as easy as my understanding from when I've looked at how these kids... Are frustrations with Uber kind of bear that out? Well, exactly. It's not that. It's just it's not always easy to pinpoint somebody's exact location. And I think the other problem with sort of like visual surveillance, in other words just putting tails on people, you know, one can do that to a point. But when you are tailing somebody 24 hours a day or every time they leave their house, the risk of detection increases exponentially. And the idea that the government should have to attempt that and risk tipping off someone like Mr. Bowman, who is, you know, a wealth of information because he's the main wholesale distributor. If you tip him off and he then basically goes underground, you've lost a huge ability to try to figure out who he's working with. Let me ask a question about materiality and how that affects our enforcement or oversight of the statute. It's your position, and it's, you know, supported by cases, that as long as if there's something that's left out of the statement that's in the affidavit and it turns out to not be material, as Franks v. Delaware would say is material, then basically no harm, no foul. So if there's an omission from the affidavit or if there's something that's false that's included in the affidavit, as long as that wouldn't affect the ultimate probable cause determination, there's no reason to find a violation, right? That's your position. Yes, that's correct, yes. I mean, you have to show prejudice. You have to show, in other words, that this would have made an impact. And I would point out here that there's been no allegation, certainly no substantive allegation here that anything Agent Fox said was actually false. The only quibbling that's going on here is to whether or not he disclosed everything that he knew. But if this court and other courts have been very clear, the government doesn't have to disclose everything that it knows. I mean, at some point, you know, it could attach hundreds of pages of pen register kits and submit all the videotapes that it has to the authorizing judge, but it wouldn't. You know, that's not going to make a difference. That's a little bit of a straw argument, I think, because, I mean, the government has an idea of what's really material. You've sorted everything through. You're in an ongoing investigation. You wouldn't know what the judge would want to know. And I think the argument, the contention is that things that were clearly material were not included. Right. And I don't think any showing of that has been shown in this case. I don't think anything here that there was nothing that was kept out that was actually material. Agent Fox was very clear that these other kinds of traditional investigatory methods were going on, pen registers, visual surveillance. The attempt to use confidential buyers from Mr. Bowman. Agent Fox described the evidence that that had provided, but then also went on to describe why it wasn't enough and why it had failed to show the full extent of Mr. Bowman's distribution efforts, but also his source of supply. And I think in this case, both the authorizing judge made the correct determination that Agent Fox was correct about that, and the reviewing judge made the same correct assessment here. The problem that I have, and it may be just the problem with the way that the case law has evolved over the last 40, 50 years, is that your approach in this case seems to read the words full and complete basically out of the statute because Congress could have just said give us a statement of necessity. The way that you analyze materiality, we'd have the exact same result because you would say as long as the statement doesn't omit something that is material in the frank sense, then the statement is fine, right? So what does full and complete add? I think it has to be more than just a conclusory statement. Obviously, it would be inappropriate if the agent were to come in and simply say it's necessary, we've tried other stuff, and I can assure you it wasn't enough. That was not what happened here. I mean, all of these affidavits go on for 40-plus pages describing what efforts the investigators had taken, what evidence had been generated, and why it was insufficient. Obviously, it wouldn't be very useful to a reviewing judge to have everything put there because ultimately it would list every fault that had been made. I mean, can I submit that in this case, in fact, Agent Fox did this fraud. They're not even taking that position in their briefs, as my colleague said. They're saying that some things like the fact that there was a PIN register on another phone wasn't disclosed. It showed the connections between Edward's phones. I'm not sure why the fact that there was a PIN register, first of all, was disclosed. Agent Fox described the PIN registers that were in place and what data had been generated as to why they thought that TT, for example, beginning with TT2, why TT2 was a necessary line. When the TT3 application was submitted, Agent Fox described in pretty good detail why they believed that this particular line, which was registered to Mr. Bowman, was likely being used to communicate with Mr. Edwards about the drug supply. So I don't think that Agent Fox here could be accused of having left anything out about PIN registered data. What he did was he described what it had generated but why it wasn't sufficient. I think some of those particular things, they're not saying give us a whole haystack. You should give the court the whole haystack. I think the specific thing they said was that, yeah, there were PIN registers, but what POC didn't say was that they'd already established an Edwards-Bowman connection through the frequency of contact between the Edwards and the Bowman phone, that that wasn't specified by POC, that there was a CS4 had detailed relationships between Edwards and Bowman and Richardson that weren't actually explained, Edwards and Bowman's physical proximity. And I think, I mean, maybe you responded to this because I thought you well explained the symbiosis between the extension on TT2 and the TT3 and the timing, and it allows the corroboration between the supply side and the retail side. So maybe that is an explanation why TT2 is still needed, but I think they're still saying, look, you've got information about a relationship and you're not expecting to find out about Edwards on TT2. You are expecting to find out about Edwards on TT3. You need to put that, explain to the judge why you still need TT2, and I'm not sure the explanation you gave us here today was adequately made at the time. I'm not sure I had understood the question correctly then. The answer to that, I think, simply is this. The TT2 line did relate somewhat to the supply, but it was mostly, by that time, certainly by March, it was clearly more relevant to determine the full scope of Bowman's retail distribution operations. As to that, the existence of his relationship with Mr. Edwards was somewhat tangential because, after all, they didn't really have any reason to think that Edwards was involved in his retail distribution side. They did have some reason to suspect that Edwards was involved with Mr. Bowman somehow on the supply side, but again, having not heard any communications between Bowman and Edwards on TT2 up to that point or seen any such things, that wasn't relevant to the assessment of the necessity of TT2. Again, the TT2 line did have some relevance to the supply side. It did have a significant relevance to it because it showed when the retail distributors were contacting Bowman, Bowman would talk about whether he had supply, when he expected to get a supply, and so that was extremely – and then, of course, when it was tied up to communications between him and Edwards, it began – it was certainly a lead as to whether or not Mr. Edwards was the source of supply, but it would have done nothing to reduce the necessity for the TT2 line. That's why it's not material, and that's why there was no material omission here such that Frank's review was required. If there are no further questions, I'd respectfully submit them to this issue. All right. Thank you. The problem with the government's argument is that there was no Frank Sheridan below, so we're limited in the facts. Make sure you speak into the microphone. Right, so the tape shows it. I apologize. The problem with the government's argument – This is Mr. LaCar. LaCar. The problem with the government's argument is that there was no Frank Sheridan below, so we can only work with the record as we were given it, and that's primarily off the affidavits of Agent Pack. Now, let me talk about Gizzo Edwards, because this is really the heart of the argument. They don't explain to you anywhere why conventional methods of surveillance couldn't have picked up what Mr. Edwards was up to. It is clear they knew his role. They wouldn't have done an ELSR check, an electronic surveillance record check, on March 9th, if they weren't focusing heavily on Mr. Edwards, who had been following since January of 2011 in an investigation that had been going on for two years. There was no evidence that Mr. Edwards, or for that matter Bowman or anybody else, was aware of the nature of the investigation. Nobody had ever detected anything. So if the government's argument that maybe the agents wanted a wiretap to avoid being caught surveilling, that's unavailable because there's no evidence of that occurring. They could easily, easily have followed Mr. Edwards as Agent Bevington did. That's in the record. He followed him and he took pictures of him meeting with Mr. Bowman. Now, Judge Wilkins, you asked about full and complete. I don't take the position that every jot and tittle has to be put down, but what I do take the position is this, that you have to give, if you're an agent, you have to give an issuing judge enough information so that he or she can determine, is this really necessary or could conventional methods do? And in this case, conventional methods certainly couldn't follow. Judge Bullard, your question about GPS. I guess I have a little experience with GPS and telecommunication. If they really thought that they needed a GPS, it would have been easy, easy to seek a warrant for a limited period of time on Mr. Bowman. And insofar as a taxi getting him to the storage shed, all they had to do was you find where the storage shed is, you get the records, then you look at the video surveillance. All storage sheds of facilities like this have surveillance of who's coming in and going back and forth. And you do it the right way. You do it with conventional methods. It is simply not the case that in every single instance of a drug conspiracy, that wiretapping is done or heard. The court says to decide one thing, is it really necessary at some point? You have to balance privacy interests, and that's all we're asking you to do. Thank you. Good morning. My name is Ed Sussman. I represent Henry Williams. And in the time allotted to me, my goal is to persuade the court of three things. First, that the facts, the unique facts of this case, support a conclusion of multiple conspiracies, that the appellant Henry Williams was not part of a single conspiracy charged in an indictment, and perhaps most importantly, that the trial judge committed reversible error by failing to give a multiple conspiracy instruction under these facts. The conspiracy, as has been discussed, should be the product of the choices and relationships of the various participants. What we see and see more often, and I think we see in this case, is that the conspiracy becomes structured by the government's mode of investigation. In this case, the government has chosen a wiretap, and my colleague has spoken to that, and it's tantamount to fishing with a net. Everyone who comes through that wiretap becomes charged as part of that conspiracy, and that's exactly what you've seen. What is lacking is the kinds of relationships that would comport with the traditional analysis that was first promulgated in U.S. v. Tarantino. You have a chain, you have a wheel. As I tried to portray in my reply brief, that oftentimes, and in particular in this case, what you have is a non-differentiated kind of structure. Can you just direct us to where in the record the multiple conspiracy instruction that was requested below appears? Where the request for it appears? The text of the instruction. What would the instruction have said? I wasn't trial counsel. My understanding, I can't recall from the record exactly what the suggested language was. I would assume it would have been a standard multiple. Well, why don't you provide that to the court for the record? I will, but obviously I'm not in a position to do that. Let's not assume. I'm sorry, ma'am? Let's not assume. I will. I'll go back through the records and send that on to the court. I guess my point is that you're arguing that there was an error in not providing an instruction, but what I can't gather from the brief is what would that instruction have said that is different than the instructions that were given so that we can assess whether it was error and whether that error was prejudicial. Well, clearly the intent of the counsel for Mr. Williams at trial was to ask the court to give a multiple conspiracy instruction that the conspiracy charge, the single conspiracy, would vary from the multiple conspiracies and to use that as a weapon in his argument. Along that line, I think it's significant for the court to know that when the jury returns its verdict, the jury did not, as the government requested, find Mr. Williams guilty of 5 kilograms or more or even 500 grams or more. The jury made no quantity finding, which inferentially gives some indication to the court that the jury was looking at something different than it was looking at for... Or that he was a lesser player. Potentially or possibly, but... That's why the nature of the request becomes significant. Well, as I said, I'm sorry I'm at a loss on that, and I'll supply it to the court. If the record does show that, I can go back to trial counsel and ask for... I mean, you appreciate the significance of the question. I do appreciate the significance, and I apologize for not noting it in my preparation. But I do believe if you look at the nature of this particular conspiracy, you have four major players who have been named before, and you have an offshoot, Mr. Bowman, who does... And then you have 12, 10 or 12 buyers who have nothing to do with one another, have no knowledge of one another on the record, have no contact with one another, nor any interdependence with one another. In short, they form the wheel without the rim. That is in traditional analysis of a conspiracy. So the notion that there's a single conspiracy stemming from the stash house to the end product of the unformed wheel, I think, is incorrect. So you would want a conspiracy of each retail salesperson with Bowman? I think that would make up the multiple conspiracy, yes. And then Bowman's conduct becomes ascribable to each retail person through the smaller conspiracy? Or his conduct through the larger conspiracy in which he's clearly a shared participant. What I'm saying, each retail defendant is, even if their conspiracy is a limited one, it's going to include the big fish, or at least the hob guy. So I'm a little bit missing what you gained from that. Well, my argument would be that Bowman has entered into multiple conspiracies with each of the 10 named and indicted persons. Potentially, you could extend that to their customers who are unknown. But the notion that he is, that all of those people who have no interdependence, don't look out for each other, don't share profits, don't negotiate together, don't do all the things that one would do in a conspiracy. But the really damning thing about someone in Williams' position is not that there are other people in his position that he's grouped together with by being part of the main conspiracy, but that he's together with the person he's buying from. And either way, small conspiracy that you propose or big, he's grouped together with Bowman. Right? He's conspiring, maybe not with all the other buyers, but with the hub. Well, then the court is saying the equivalent of everyone who sells drugs is a conspirator with someone. You get it from someone, you sell it to someone. I think the structure of the thing matters. You know, who is your one degree of separation person? And if there's going to be a conspiracy chart here at all, it's going to connect people who deal directly with Bowman with Bowman. I mean, maybe I'm missing something. No, but I think you're coming dangerously close to making conspiracy a status quo. No. I mean, I do think it associates people with other people who do bad things and attributes their illegal conduct. And that's the nature of conspiracy, which is a troubling concept. But that's true in every case. So I think the structure of the relationships do matter, and I'm not sure the structure here is one that really demands the separate instruction that you're asking for. And I'm just probing whether you can give me more on that. I think the government chooses how to indict this case, obviously, and the choice they made was to indict everybody who was similarly situated to Mr. Williams. And there was absolutely no evidence that Mr. Williams had any contact with those people, had any knowledge of their existence. It feels like you're making a severance argument in the form of a multiple conspiracy charge claim, and, you know, that's very much within the discretion of the district judge. It is up to the discretion of the district judge. And Williams was further disadvantaged by being the only one of the real defendants who sat through the trial, who went to trial, and perhaps had there been more people there, there would have been more telling in terms of the actual. But that cuts against you, doesn't it? The prejudice is not really there. Well. I mean, it comes from non-severance, whatever there may have been. But the distinct prejudice from no separate instruction, it's just unclear to me how any such prejudice, assuming there were such prejudice, would be mitigated. As indicated, the jury, inferentially, was at least saying, well, he might have been a leisure player or he might have been involved in something totally different than the, you know, the tinker-stabbers-to-chance kind of conspiracy we typically see as a chain. Clearly, he had no knowledge of the stash house, its existence, its placement, the weapons, nor did he have any knowledge of the other end. What he knew was Bowman. Can I ask you, Mr. Chessman, this is a little bit of a change of topic, but are you going to address all the Agent Bevington testimony? No. I think one of my colleagues is going to do that. So if there are no further questions, I think that concludes my presentation. Oh, that's right. I apologize. You switched sequence. Stand for a minute. All right. Thank you. Thank you. Once again, Nick Coleman for the United States. I think to follow up on what Mr. Sussman was saying, that somehow Mr. Williams was solely dealing with Mr. Bowman, he knew that that was not true because, as we know from the conversations that he was having with Mr. Bowman, he was well aware, A, that Mr. Bowman was obtaining drugs for him from another person because he talked about how he needed to talk to his man. He was also aware, because Mr. Williams told him at one point during the calls on March 21st, that he needed to not have everybody come to him at the same time. On March 21st, in particular, it was an extremely busy day for Mr. Bowman. He met not only after getting more drugs for Moore, but he met with a large number of people, Ismael Brooks and Mr. Williams. But the point of the multiple conspiracy instructions is kind of similar to the point of the language that the district judge added to the conspiracy instruction here, which is that it's not just if you buy some drugs from someone that you automatically join the conspiracy that your supplier is involved with and all of the people that his supplier's supplier are involved with, etc. There has to be knowledge and an intent and all of that to join that conspiracy. Right, and I think that was shown here, Your Honor. But I guess whether it was shown or not isn't the issue. The issue is whether it could also have been shown that he was involved in a different conspiracy than that big one that involved Bowman and Edwards and Richards and Moore and all the rest of them. And I do think that even if that were the case, I certainly don't concede that. I don't see how Mr. Williams could show prejudice here, because he was not found responsible for the full amount that his co-conspirators were. And so even if he had been convicted of a separate conspiracy with Mr. Bowman, he would have faced the exact same sentence. So he would have had no difference. Well, let's assume for a moment that what if there is a retrial of Mr. Williams, because we find error or some other reason. The trial judge wouldn't be dealing with prejudice. The trial judge would be dealing with should there be multiple conspiracies and structure. So tell me why it would be appropriate not to give one based on this evidence. I think in this case, first of all, there are two issues here. One is whether this is strictly a buyer-seller relationship, and then the second is whether it's a separate conspiracy. With respect to the buyer-seller claim, which Mr. Williams has occasionally invoked, that is clearly disproven here by the fact that Mr. Williams had a pretty long-term relationship with Mr. Bowman. He was able to call him on his line. He inquired numerous times about when he would be able to comply. You're not understanding my question. You're saying that buyer-seller was disproved. Are you saying that the trial judge shouldn't have given some buyer-seller language in the instruction? Well, and I believe it was, as part of the conspiracy instruction, that it's a mere buyer-seller relationship. So that was instructed. I understand. I'm sorry, go ahead. I understand. I mean, my point is why, if there was sufficient evidence to give a buyer-seller instruction, why wasn't there sufficient evidence to give a multiple conspiracy instruction? Because here there was no evidence of a separate conspiracy as opposed to a wider conspiracy. And I think this court has been pretty clear, if you look at Tarantino, as said, a single conspiracy may be established when each conspirator knows of the existence of a larger conspiracy and the necessity for other participants, even if he is ignorant of their precise identities. And that was exactly the case here. There was no reason to, there was simply no evidence here to hold that Mr. Williams was unaware of Mr. Bowman's participation in a much wider conspiracy. You're saying that Tarantino stands for the proposition that if you buy, if somebody buys drugs from someone and they know that there are other people involved, then per se there could only be one conspiracy. That's what Tarantino means? I think what it shows is, if you're going to find a conspiracy, obviously there's, and again, that's why I wanted to address the buyer-seller relationship first. Somebody who buys one time from one person, even though they're aware that the drugs had to come from Colombia or Mexico or wherever, and thus is aware that they were brought by another conspiracy, doesn't by itself join the conspiracy. But where you have a person with a relationship and by buying in quantities from a person is aware, is able to contact this person and obtain drugs over a long-term basis, he's associated himself as part of the conspiracy, and there's no reason under the law to separate his particular conspiracy from the one that Mr. Bowman. It's pretty tough. I mean, I recognize there's a hard line-drawing issue here. How do you respond to Mr. LaCar's point that every buyer of illegal narcotics knows that there's a supply operation behind the person that they buy from, and you could be a regular retail buyer, and by that token, you're part of the conspiracy? Well, are you talking about a user, Your Honor? Well, I mean, I realize there's like maybe you're casting Williams as sort of a franchise as opposed to just a user. But the question is, I mean, there's line-drawing problems all the way along that spectrum, right? There's always going to be some line-drawing, but I think one of the clearest lines one can draw is this. The street-level buyer who's buying for consumption is not associating themselves with a distribution network. When you're talking about a middleman, in other words, remember, it's a conspiracy to distribute drugs. So the fact that you purchase, you don't become a part of Home Depot simply because you purchase products from them. On the other hand, if you become a franchisee of Home Depot, you're acquiring Home Depot's products to resell them under Home Depot's name or simply buy them so that you can resell them. You have now become part of a distribution network. Mr. Williams was not buying drugs for his own personal consumption. He was buying drugs on a regular basis from Mr. Bowman for retail redistribution, as far as we can tell, in quantities that would suggest or likening quantities that he was selling then to street-level dealers because that's what most of the people in his position were doing. They were reselling it to street-level dealers who, in turn, were then selling it, presumably, to buyers. So that's the key distinction there. That's why, again, the jury was correctly informed as to what it had to find here, which is that Mr. Williams was associating himself with a conspiracy to distribute drugs. I think I mixed up. I referred to the wrong defense counsel. Yes, that was the wrong counsel. Apologize, team. But I think in this case, the evidence of Mr. Williams' knowledge that there were a number of other participants in this team and his access to it, to a regular large supply of drugs, one which he frequently accessed, as shown by the calls, shows why the multiple conspiracies instruction wasn't appropriate. But again, in this case, he certainly would not be able to show any prejudice because even if he had been found guilty of only the single conspiracy that he claims with Mr. Bowman, as if he were unaware of everything else that Mr. Bowman was doing, the result in this case and his sentence would have been exactly the same. So your hypothetical, your Home Depot hypothetical, somebody regularly purchases items at Home Depot and drives 100 miles away where there are no Home Depots around and regularly resells those items or maybe even buys items when consigned to them. He's got a car, but the other folks don't, so they tell him what they want from Home Depot and then he goes and buys it from Home Depot and brings it back to sell to them. That person is now effectively in a conspiracy with Home Depot because Home Depot is their supplier. Whether they are legally part of the same business or not, it goes far afield from my area of law. I would say that under my hypothetical, the problem there is that, yes, this person is purchasing regularly. Now, again, there's a difference here. Obviously, Home Depot, the corporation, may not be aware of what this person is doing. That's sort of where the hypothetical breaks down here because Mr. Bowman was certainly aware of what Mr. Williams was trying to do with the drugs. That's where, again, the question is, and the distinction that I'm trying to draw, is between the true retail customer and the person who's trying to be yet another link in the supply chain down to the retail customer. Mr. Williams was that person. He is the person, either the franchisee or the person, perhaps, who's trying to take some stuff and resell it on an ongoing basis, but he's not a person who's just buying this for his own personal use. If there are no further questions, again, we respectfully submit that the judgment of the district court be affirmed as to this issue. Thank you. Just to respond to your question about the transfer of the citation and the construction, I think the court referred to footnote 320 in the final brief. Let's see. This is Mr. Sussman speaking. That is. I'm sorry. That is referenced. I will check it as well, and if it's not complete, I'll furnish that. All right. Would you repeat the substance of your statement? The issue about the instruction that was given, there's a reference to footnote 320 in the final brief, to the Joint Appendix citation where that request was made. And the final brief being the opening brief or the supply brief? Opening brief. Thank you. Page 102. Good morning, Your Honors. Julie Griggs on behalf of Mr. Bowman. My argument also, I have arguments that relate to Mr. Williams, too, because they were interrelated by virtue of the order. In which you would like to argue these issues. Well. So that we can direct our questions according to that. Yeah. If I could, I'd just comment on the multiple conspiracy, just because it came up. But the order, I will argue, is the reason or the motivation for wiring Bowman's plea to Williams, whether there's enough in the record to show a relationship between the lack of evidence against Williams and the wiring of Bowman's plea to keep Bowman in the trial with Williams to benefit from guilt by association. So I have to discuss that lack of evidence briefly. Just tick them off. And then other, I don't have a witness from the U.S. Attorney's Office that said, We wire Bowman's plea to Williams pleading guilty to keep, in case Williams did not plead, to keep Bowman in the case to get the benefit of all this evidence against Bowman to spill over to Williams. And interestingly, that relates to the multiple conspiracy issue in some way as well as the severance issue. It's all interrelated. So I will address them as quickly as I can and hopefully point out to the court the interrelationship of those matters. But the key question, I think. We trust you are going to discuss the Hampton issue. Excuse me? Agent Bevington's testimony. Oh, absolutely. Absolutely. Because when Mr. Coleman says, Well, Mr. Williams was discussing where he could get his drugs from and this and that, and always mentioned, That's all Agent Bevington's testimony. And there was no evidence that they talked, Williams and Bowman encoded conversations. There was no evidence of any narcotics. I'm definitely going to discuss Agent Bevington. But if I could just briefly tick off the factors and then I'll come to Bevington. Mr. Coleman said there was a long-term relationship between Mr. Williams and Mr. Bowman. What long-term relationship? He had a couple calls in January of 2010 and didn't meet with him until March and met three times. And when he says it was a long-term relationship and they were discussing narcotics, they had this key conspirator in the case testifying, inside court conspirator Willie Sean Moore, didn't say boo about Mr. Williams. That's a person. They had another conspirator. There was no witness to say that Bowman conspired with Mr. Williams. And I think I can point out to the court what happened here. All right. In response to the question, is there enough to show a relationship between the lack of evidence against Williams and the wiring, the conditioning of a plea by Bowman upon Williams pleading guilty, no coded language, no discussion of cocaine whatsoever, no possession of cocaine by Williams, no seizure of cocaine, no inside witness implicating him, a very brief encounter. And if it was me and I happened to be talking to Bowman during that period and we were talking about things and then I met with him three times because Bowman was there, I'm guilty. I'm guilty because of all this other evidence of everything Bowman was doing. And that will relate to the severance of the multiple conspiracy as well. All right. Now we'll get to Bevington. But I want to mention, okay, which troubles me, two things. All right. They had Williams in phone calls in January. There's no one. Where's the investigation of him? Later on when they did the takedown, they were seizing stuff. They were going in the people's apartment. They never, maybe they did track him. Maybe they tracked Williams and they came up with nothing to show he was possessing and distributing. I think they did. But it didn't come out because with all the other conspirators that got arrested, they searched their apartments. We discussed that in their brief. They recovered things. I think they did. They didn't come up with anything. So there's no investigation. They had a shortcut. That shortcut, which I also argue was agent Bevington. All right. Well, we didn't do any investigation. There's no cocaine. There's no money. We got nothing. But we'll use agent Bevington to supply what's missing. And when the defense asked for discovery of all opinions under rule 701, which is lay opinion, and 702, what did the prosecutors say? No expert opinions because no coded language. And they also said, and this is in our brief, that agent Bevington is not going to interpret any phone calls between Williams and Bowman as having any particular meaning. Well, that tells me there's going to be no things. They sandbagged him because at trial, that's all Bevington did. He said, well, Williams meant this, you see. And we cite on our brief, the opening brief, we give a litany of his opinions. Williams meant this. He got cocaine this. He's going to pay him for cocaine the day before. There's no evidence. If they could use that, why didn't they follow him? Why didn't they arrest him? Why didn't they obtain cocaine from him? Why didn't they see if he's distributing to anybody? They didn't have it. They didn't have the evidence, and they knew they didn't have it. And that's why they wired Bowman's plea to Williams. Now, I will say I'm very troubled by one thing in this case. Okay, because when you say in these kind of cases to a main defendant that we'll cut 20 years off your jail sentence if this little marginal guy pleads, if he vanishes from the case, I don't think that's a very good thing to do. I'm very troubled by that. But why, Mr. Greenspan, is that a complaint of Bowman's? If I were trying to identify who is disadvantaged by that, I would be very afraid for Mr. Williams because it creates, as you're suggesting, pressure on Bowman to take care of Mr. Williams and his failure to plead guilty. But I'm not sure why there's any kind of pressure or coercion that we under our precedence can find impermissible against Bowman. I'm just saying I'm bothered by it. Okay. I'm not saying that. Well, you're objecting to the wired plea. I mean, that's one of your claims. Yeah, it's a wired plea. I'm just troubled by the concept of wiring somebody, in this case saying we'll take 20 years off your jail, when you have a very weak, virtually nonexistent case to get that conviction, to get him out of the case. Why is that, though? I mean, you're arguing that on behalf of Bowman. Why are they doing it? Yes. No, no, no. I'm asking what is impermissible from Bowman's perspective legally about having done that. Conditioning his – okay, legally conditioning his plea upon a plea by Williams giving him 20 years off but refusing to let – they offered Bowman a plea with 25 years in jail instead of 45. But they said – the last thing they said was, but only if Williams was guilty. Bowman has no control over what Williams does. True. Did they offer him – the record is slightly ambiguous on this. Did the government also offer Bowman a plea if he would cooperate? They did originally, and he said he didn't want to cooperate. But the last thing, the last condition, and actually I think this is a piece of very telltale evidence. They said, well, okay, you don't have to cooperate. We'll let you out if Williams also pleads guilty. Yeah, he doesn't have control over it, but that's life. There are a lot of things you don't have control over. That doesn't make it coercive with respect to him, does it? Well, when they say in the end – he said he'd take the plea. He said, I'll plead. The government didn't require him to testify. Typically, one only gets a plea in exchange for something that helps the government. And the question is they're giving him two options. One, okay, you get the plea and its benefits if you cooperate. That would help us. He says no. Okay, here's another idea. You get the plea if Williams takes a plea. There's some relationship there. Up to you guys. Maybe he gets lucky and Williams just looks at the evidence against him and decides to plead. Maybe they have a conversation. In any event, I don't see what's impermissible. You need to help me appreciate what's impermissible under the case law about conditioning Bowman's plea on whether Williams does or doesn't plead. Because if they wanted to get a conviction, if the purpose of saying, well, we'll let you plead if he consults you, and their purpose in doing that has an unconstitutional purpose, which is it's more directly against Bowman. I admit that. But it also affects Bowman. Because you're saying if the purpose is that they want to get, if Williams decides to go to trial, a conviction to be built by association of sitting through this trial of Bowman and all this stuff, when they have a very shaky case, if a case at all, against Williams, I contend it's an unconstitutional purpose. Now Pollard, if I can refer to the Pollard case, they said to Pollard, if you plead guilty, we'll go softer on your wife. Pollard had control over that, total control. The court said they were bothered by a wire of pleas in Pollard, but Pollard could decide, okay, I'll plead or not. In here, Bowman wanted to plead, but he couldn't plead because, and that cost him an extra 25 years because Williams didn't want to plead. Williams had a right to a trial by jury. So what's Bowman supposed to do? They did offer him which thought that he merited 25 years, only 25 years. It cost him that. Why? Why cut 20 years off? That's what they were willing to settle for. But to deny him that so they could get in all this evidence when they had no case, they really didn't have a case against them. They didn't have any cocaine. I repeat, I don't want to sell the case. You're talking about Williams. Can you check with the Bevington testimony because they rely heavily on that, and they say that's permissible and we do have a case. So it seems to me you have to persuade us not to rely on that in order to put the case against Williams. They have Bevington testifying, for example, that Williams was letting Mr. Bowman know he had money for him that was owed for the cocaine Mr. Bowman had supplied the previous day. That's pretty straight up evidence of Mr. Williams' involvement. They're arranging to meet so that Mr. Williams could pay Mr. Bowman for cocaine that he previously received. That's JA-1947. So we have a lot of Bevington testimony implicating Mr. Williams, and you need to take that on. Right. And if I can just draw the analogy, if you have a bid-rigging case and FBI agent is investigating, you can't say, well, they're discussing rigging bids and they're going to match bids and so forth in my opinion. You can't do that. You're supplying the elements of the offense to the jury, and we cite cases, and I'll repeat some of the citations now. And then I may say that kind of lay opinion is improper because they hark back to the old helpers, you know. You know, the judge said. Well, I think that the government can essentially confess his error, but they say it's harmless. Why don't you address the harmlessness issue? Okay. Well, it might have been harmless had they had evidence against Williams, but when you have a case, Your Honor, where they don't have Williams talking about cocaine, one of the cases says, you know, I'm going to repay the money I owe you. They never talk about cocaine. The FBI never sees cocaine from him. They don't have any evidence of him distributing cocaine. They have him in a wiretap since January. How do they explain that, that they didn't investigate him? Unless they did and they didn't come up with anything. But they're keeping him in this conspiracy. The other thing they did was in their opposite. I just need to digress for a second. In their opposition to severance against Williams, they said there's a strong case, and he's interconnected with all the other conspirators. He didn't know anybody else except Bowman. And he ignores his substantial role in the conspiracy. He met with him three times. The FBI had no evidence. What they were going to do was they were going to shortcut the fact that there was no investigation by using Bevington with these expert opinions. And there's the Garcia case from 2005 in the Second Circuit. See if in their discovery, in their responses to discovery, when Williams' attorney asked for the evidence, or what they were going to provide, by the way, with expert opinions, and they said there is no expert opinions. And also said he's not going to interpret any words. What do you think? Fine. And then boom, one right after the other. So that's what he was doing. And by doing it that way, the defense never even had a chance to brief it. And there were plenty of cases prior. Hampton is the case in this circuit that says no lay opinions, telling the jury what conclusions to draw. You know, the government says, well, it's obvious what they meant. Well, if it's so obvious, why did you need the strength and the force of an FBI agent to come and tell the jury what conclusions to draw? You know, jurists would say, well, I think it might have been. Another one might say it might have been. And then the jurist says, yeah, but the FBI agent who knows a lot about this, he said they're involved in narcotics. So it's like saying in a fraud case, SEC for whatever kind of fraud, well, I think that they were discussing how they were going to defraud this customer. And when he says that they was going to acquire cocaine and he meant I'll get the cocaine and I've got a customer waiting, he's supplying the elements of the offense to a jury. I don't think you can have a law enforcement agent come up and do that. And we cite the Garcia case in the second. So there's a couple of Garcia cases. There's one in the Fourth Circuit that may be Urey. The Second Circuit was Urey in 2005. And that cites the Grinnell case, a very important case. I think the Hampton case from the circuit is quite relevant. Yeah, they said it's plain error. But it was plain error before that, before the Hampton case. And, you know, you have, what is a lay opinion? A lay opinion is, you know, color, speed, weight, things in our ordinary experience that, you know, it's difficult to describe in words. Well, he was going faster than this truck. So you say, I think he's going 35 miles an hour. But not something acquired through specialized knowledge. What he was doing was providing expert opinions, which he shouldn't have been allowed to do anyway, under the guise of lay opinion. I'm not sure I see this as expert opinion, because there's no field of expertise that allows one to listen to someone saying, I got that for you and some more, and translating that into Williams was letting Mr. Bowman know that he had money for him that was owed for the cocaine Mr. Bowman had supplied the previous day. I don't know what field of expertise allows one to make that translation. But I am curious about your views, given that there is a role for lay opinion testimony under federal evidence 701, how, if the government were to do this, would they have done it properly? The theory being, here's an agent who has a lot of observation and knows more about the context and might be able to understand, because of his information about the context, what actually was being said. Is there some background evidence that could have been specifically identified that would have then allowed Agent Bevington to point to these in a way that would inform the jury or just off limits altogether? There is a way to do it. Tell me what it is. The way to do it is the government has to do that in summation. That's the place to do it, because the court has said, you can't use a summary witness either, whereby the prosecution gets essentially two summary witnesses, but one in the form of FBI testimony, which the jury gives strong credence to. Well, Hanson makes clear that the summary witness precedent is relevant, but I suspect the government is going to argue that that's not what we're dealing with here. So that, I assume, raises for Judge Pillard's question about how could Agent Bevington properly be used as a lay witness, a lay opinion witness under Rule 701? He can't. He can't be used this way to say, to opine on state of mind and provide the elements of the offense. That's our system of justice. But he can be a reporter as to what happened. A warrant was issued, they seized drugs, et cetera. Now, the district court tried to draw or drew a distinction between his testifying as an expert as to coded terms, and the argument is there were no coded terms in the recorded conversations in which Williams was parting to the conversation. Correct. So is there no role for an FBI agent who is a case investigator to give lay opinion testimony? Not providing the elements to the jury. I'm confused when you say not providing the elements. Every witness, the whole point of the trial is every witness is testifying to facts that support the elements of the offense. So you need to be a little bit more precise. In other words, what could he say when he says to the jury, I listened to the tape recording on January 10th, and the two parties said X and Y. Now, can he say, consistent with Rule 701, when they talked about X and Y, they were referring to a purchase of cocaine? My argument is he can't. He cannot. My argument is he can't. Yes, could he do so as an expert witness in your view? If they use coded language. Well, that was a district court's ruling because she qualified him as an expert, but an expert as to coded language only. Right. And Bevington also testified they did not use coded language, and the government said pretrial, we are not going to use Bevington to attribute any particular meaning to what Williams and Bowman were discussing. So they can't. If they can, why can't they in a fraud case, which is very complex, a lot of these fraud cases, why can't an agent say, yes, I listened to the conversations, and I think they were discussing how they were going to deceive these investors. There's really no difference. But you can't do it because if you could do it, I could be coming along. I could have a conversation with Bowman. I could have several conversations with Bowman. At the same time, he's doing all these other things. Okay? And I could even meet with Bowman. All right? Now, and then I leave. And that's what I've done. And there's no evidence. I discussed narcotics. No evidence I possessed it. Maybe I was talking to him about a restaurant. But Bevington comes in and, wow, I'm guilty. All right. Why don't we hear from the government, and we'll give you a couple of minutes. Sure. Give us an applause. All right, thank you. Thank you. Again, this is Nick Coleman for the United States. I'd just like to very briefly address the wire plea offer issue before proceeding to the agent Bevington testimony issue. I think the basic fact is this. Mr. Bowman's counsel has argued repeatedly that Mr. Bowman was not able to plead. That is not true. He had three options, obviously only one of which was beyond his control. One was to try to convince Mr. Williams to take the wire plea offer with him. Obviously, he didn't have control over that. He could have, as he acknowledges here, testified or agreed to cooperate and thus accepted a plea that way. Third, he could have pleaded to the indictment if he didn't want to cooperate and gotten the reduction in sentence for having accepted responsibility. So those are his options. He elected not to take any of them. So it's simply not the case that he had no options here and that he was not permitted to plead. He just didn't get the plea offer that he wanted, namely an unwired plea offer, with the same charges and agreed-upon sentence as the wired plea offer with Mr. Williams. There was a separate cooperation offer that was unlinked to any action by Williams? Yes, that was discussed at the September hearing before the October hearing is the one where the final rejection of the wired plea offer is discussed. But in September, the government did state that it had discussed a plea offer under which Mr. Bowman would cooperate. But Mr. Bowman, through counsel, stated he was not interested in talking to the government about that. So again, the idea that there was some sort of unconstitutional purpose behind this, because it's not unconstitutional for the government to wire a plea. It's not unconstitutional for the government to seek to resolve an entire case or a large chunk of the case by pleading out all of the defendants at the same time. That's not unconstitutional, and there certainly was no unconstitutional pressure put on Mr. Bowman. As we hear today, it seems like the only unconstitutional pressure they're talking about is with respect to Mr. Williams. But again, Mr. Williams isn't raising this issue. It's only Mr. Bowman who claims prejudice from it. I'm really interested in your views on whether the Bevington error was harmless or not and what you think the unaffected evidence is and why that would support a conviction. Well, the unaffected, and I take it here based on, although it was Mr. Bowman's counsel arguing, that really the only issue here is whether or not this was harmful with respect to Mr. Williams. After all, with respect to Mr. Bowman and Mr. Edwards, there was a very large amount of evidence completely unaffected by Agent Bennington's testimony, which I won't go into here. But even with respect to Mr. Williams, the government, we tried to summarize on pages 25 through 31. Well, Bennington is certainly involved in all of this evidence presented against Mr. Williams in the sense that he has asked about his interpretation of the policy. He's the key witness, isn't he? Well, he was the agent through whom all of the wiretap calls were introduced in the sense that he authenticated them and could testify as to when they were made and who was on the call. He then was also called upon to do two things. With respect to other witnesses, he was called upon to give expert testimony as to the use of certain code words. Let's focus on Williams. And the problem here, which is not the expert testimony, but the expert testimony juxtaposed with lay testimony, where he is making leaps that in light of our Hampton opinion, and I realize that that was not on the books when the judge was managing this trial, but it's somewhat startling to see the translations that he makes and try to understand those as rationally based on his perception and as opinions that a jury has any factual ground to independently assess. I just don't see it, and I'd like your help. I think if you go through what Mr. Williams actually said during these calls when he's discussing with Mr. Bowman and when you also compare it with the conversations that Mr. Bowman was having at the same time with other retail distributors, I think when the prosecutor argued to the jury, you don't even need an agent's testimony to understand what's going on. That was a last gasp. I'm sorry, Your Honor. That was a last gasp. I mean, the problem was that they did have those arguments was based on Agent Bevington's testimony, and that's the way the case was presented to the jury. And what I'm trying to understand is it's not a question of sufficiency of evidence to convict. It's how can we be certain that the jury was not substantially influenced by this impermissible testimony. I do think I just want to respond to one factual point. The prosecutor in closing certainly did not say, as Agent Bevington told you about these calls between Mr. Williams and Mr. Bowman, you know, that's how you know. In fact, it was quite the opposite. I don't think it was a last gasp because, after all, at this time, nobody even thought that it was an error to introduce this. Well, with all due respect to the government on that, 701 has been on the books for some time. Yes, Your Honor. In this circuit, we have issued cautionary statements. The other circuits were holding clearly that there are problems here. So this is the United States government. There's an alert out there, it seems to me, that you have to be really careful here. And you've confessed error in your brief. Yes, we can – well, we have to post Hampton. No, we did. We understand that. But, of course, Hampton wasn't on the books at the time. My only point is that if you look at how the prosecutor – But it's not as though Hampton is coming up with some unusual rule that is not signaled by the difference between lay opinion testimony and expert testimony. My point is whether or not the prosecutor here – if the point is that the prosecutor here was somehow just trying to throw something in to render this harmless in a future argument, I think when you look at the prosecutor's argument in total, his argument to the jury was, look, you don't even need an agent because when you look at what Mr. Williams was saying, juxtaposed with what we know about Mr. Bowman's interactions with Mr. Moore, about his sources of supply, how he's talking to other distributors, it's easy to tell what they're talking. But, Mr. Coleman, that's precisely Mr. Greenstein's argument is that that's the right way to do it. And we've all done trials. We know that you put in some mosaic pieces. They don't necessarily all compute when they're being put in evidence. You know, you have this little bit cryptic conversation. And then the prosecutor has to say to the jury, look at that next to that. Okay? Draw your own inferences. And that's not the way this case was tried. And it really – I'm sorry. Go ahead. It's very hard to sort of think we could unwind that. When Mr. Babichan has gotten up on the stand and thinks that say nothing about cocaine and paying for cocaine are translated for the jury into things that say things about cocaine and paying for cocaine. It's just very hard for us to see what your case is for why we could still go ahead and confirm, given the hints and errors. That's what I'd like to hear is what do we rely on and how? In this case, we know from Mr. Moore's testimony, for example, just the March 21st transactions alone, you have the recorded conversations between Mr. Bowman and Mr. Moore, arranging to acquire more supply from Mr. Moore. Immediately after, at the same time, Mr. Bowman is telling Williams, he's telling I think Brooks, I think he's telling Ismael, he's telling several other people similar situations to Mr. Williams, I need to talk to my man and I'm going to get this. He meets with Moore, Moore testifies at trial, I've provided him with the drugs, and then you have a series of meetings between not just Williams himself, but Mr. Bowman and a number of the other participants in this scheme right after that. And that would be your case. Yes. That would be your case without Mr. Bowman, without Mr. Babichan. That would be the case. Yes. And then the question is, well, you know, defense counsel could argue, well, they were talking about theater tickets, not about, you know, getting drugs. They had, you know, whatever. But the question is, I think that we have an obligation to look at the potential paint from the erroneous testimony of Mr. Bevington, and how do we have any confidence that the jury wasn't quite overwhelmingly swayed? Two things I think are interesting to note. If you look at where this court has found the specific error in this kind of thing, if you look at Miller, for example, which was decided after Hampton, what this court said, and this is on page 384, I'm sorry, let me make sure I get the right pagination. Yes. Page 384 of Miller, which is 738F3361. The admission this court held, that the admission of the government agent's interpretive lay opinion testimony about these various calls was plain error under Hampton. Their interpretations of non-coded language was erroneously admitted because they did not set forth the specific basis of events, other calls, seizures of contraband upon which their opinions rested, other than broad claims of acknowledging a gain from the investigation. One of the interesting things that's different in this case is that most of the time, Agent Bevington was asked, what do you base that conclusion on? He would say it was based on those two calls from earlier. So the jury was told what Agent Bevington was basing his opinion on in a lot of these cases. Now, sometimes he didn't. Okay, we have to admit that sometimes he said he acknowledged the investigation. But in this case, he made very clear that he was interpreting the calls, and he made clear during cross-examination that he didn't know Eden had seen cocaine, but he was interpreting that. So I think the jury was well aware that this was an agent's interpretation, an agent who was part of the investigation. They were well aware of what the evidence actually was against Mr. Williams, and there wasn't really much risk here that they were being misled by Agent Bevington's testimony Were the jury given any kind of instructions about how to interpret Agent Bevington's testimony? I'd have to go back and check and see. I do believe, obviously, they got the standard instructions about expert opinions. I'm not sure whether there was a lay opinion instruction. I'll have to go back and check that. Did the standard expert instructions say anything about Bevington in particular? Was the jury ever told that he was an expert, what he was an expert for, what he was qualified to opine on? The answer to that is yes. They were told that he was testified as an expert only with respect to the code words. And even with respect to his discussion of these calls, the government was very explicit in framing his questions as to whether or not he was asking Agent Bevington for an expert opinion about the meaning of a code word or whether this was his opinion based on some other piece of knowledge. So that was clearly defined for the jury. The expert instruction, as I recall, and I have it right in front of me, but as I recall, it didn't specifically tell the jury what Agent Bevington was testifying about as an expert, but it did tell the jury, as it always does, that they were free to accept or not accept the expert's opinions. Now, I'll have to go back and check about the lay opinion testimony to see if there was an instruction. At JA 1815, the district court refers to orders she has issued, and she references these orders in later discussions with the prosecutor and defense counsel regarding concerns about Agent Bevington's testimony. Neither I nor my clerk have been able to find those orders in the record that we have. Could you supply those for us? Yes, and I'm sorry, if you could remind me what the date is. JA 1815. 1815, so, okay. It may be that they're just, you know, from the bench-spoken determinations, but I had the same question, whether there's anything more fulsome and systematic that's drawing the line that she's then referring back to. Can you tell us, when you read what the district court has said, the implication is in these orders, whether they were oral or written, she has outlined precisely how Agent Bevington may testify, and even though the defense had objected, she had ruled, and at points, the prosecutor says, yes, Your Honor, I understand, and then he asks a question saying, well, Agent Bevington, you're an expert. Now, my second question is, were all the telephone calls admitted into evidence? Every intercepted call, Your Honor? In this investigation. In other words, in total. I'm not sure. I know for a fact that all of the calls that we've referenced in our brief were certainly in evidence. There is a practice, I know, sometimes where every wiretap conversation is sort of submitted as a disk. I'll have to go back and check and see if that's true. Would you give us a record cite on that? Sure. And Agent Bevington at one point says, I've listened to all the calls, and he says something else like, I've looked at the videotapes, but all the videotapes are not before the jury. I don't know whether he's saying they're never going to be before the jury or simply that the jury hasn't seen them at that point. So I'd also be interested in whether all the videotapes were entered into evidence. Because, as you know, our court, as well as other circuits, have focused on that as to whether the jury has this independent means. And it's not simply the agent saying, I've heard or I listened to the call of January 10th, and here's my opinion about what's going on. And Hampton seems to impose on the government a much higher burden in terms of indicating the basis of the prosecutor's, excuse me, indicating the basis of the 7-0 witness's lay opinion. Right. So that Bevington has already told the jury he's listened to all the calls, so that if he is talking about the January 10th call, how is it influenced or not influenced by the other calls? I'm assuming, but I can't tell from this record, whether or not there was a discussion off the record or in chambers with the judge about how this was going to proceed and these issues were going to be handled. I have no information about any off-the-record conversations. Okay. Of course, I don't have any information as to whether that even occurred. I do think with respect to the calls involving Williams, you know, frequently Agent Bevington specifically stated, you know, his lay opinion was based on this call and the previous calls heard with Williams. In other words, were they going in the sequence of playing calls that involved Williams, and then saying on the basis of those calls, I think this is what they were talking about. I'm not aware of very many. There's certainly no instances where Agent Bevington expressly stated, I know of other evidence or this is based on, you know, other observations that were made. Why don't you turn to page 71 of your brief. Yes, Your Honor. The very top of the page. There's a reference to JA 1906-1907. Yes. And it says, opining based on calls and meeting between Bowman and Williams on March 12, 2001, that when Williams told Bowman during a conversation on March 13 that he, quote, got that for, it's inserting Bowman and some more, end quote, Williams was letting Bowman know that he had the money for cocaine Bowman provided the previous day. Yes. How can you give that opinion just based on what you've heard in phone calls? The, I'd have to, the. I mean, you say he's not giving the opinion just based on what he's heard in phone calls. You say in your brief. Right, based on the meeting. Based on meetings. Yes, and he had specifically testified about specific meetings that had been videotaped. In other words, that testimony was also provided to the jury. Certainly those meetings, he testified and I think at least one other agent also. What's the basis for him to say that it's cocaine that he's talking about as opposed to marijuana, heroin, or Girl Scout cookies? Right. I think the basis here was this was, we certainly knew that Bowman was trafficking in cocaine. That was what he sold. That was the only drug that he was selling as part of this conspiracy. The fact that, you know, the jury was well aware. He had been, he had made several controlled deliveries of cocaine. We had testimony from Moore that Moore had provided. I understand all of that, but here's my point. Is that you're making this seem like lay opinion testimony under 701 is what this is. And it's really just somebody not really using any specialized expertise. They're just listening to some phone calls and saying that based on the language in that call, they can tell that when they say, you know, X and Y, they really mean Z. You're telling me now is that lay opinion isn't based on kind of, you know, really interpreting the language. It's based on interpreting the fact that there's been all these other controlled buys, that we saw a meeting that happened, et cetera, et cetera. And it's 95% based on things that happened other than the phone calls. Right? Well, I think there certainly was a lot of evidence from which the jury could conclude, and we would submit overwhelming evidence from which it could conclude, that that was exactly the subject of these series of calls over the course of a couple of months. With other people as well. With other people as well, yes. I mean, one of the things you said today was helpful to me. I'm really still trying to understand how the lay testimony can be used properly, if at all, in a context like this. And I thought one of your responses earlier was quite helpful in that regard. You were saying one of the ways that Agent Bevington thinks he knows what this call is about, even though it's so cryptic, is that you have more explicit parallel conversations going on right around the same time with other people who are in a similar position, vis-a-vis Bowman, to learn of this position. He's calling around and saying it's coming in, it's coming in, it's coming in, it's coming in. And, you know, they're having sort of this, and there's a pattern, some of them more explicit than others. Timing, the background. What I would expect to see, if this is a lay witness and it's being put on in a way that the jury can evaluate, is for the agent to say, you know, is this an accurate recording of a conversation between Mr. Williams and Mr. Bowman? Yes. Do you have an opinion about what he means when he's talking about paying you money and what he's paying for? Yes. On what do you base that opinion? Well, I had listened to a bunch of other calls, and this call said explicitly this. That call said explicitly this. That call said explicitly this. Plus, we had information from physical surveillance about a big shipment of drugs coming in. And when I put all the timing together and when I look at the analog here and I know inferentially what I know about Williams, I draw the conclusion that he's talking about drugs. Then the jury can sit back and say, oh, okay, I see his chain of reasoning. I see the observations. You know, this is the lay testimony aspect from which he's making those inferences. But when you read the record in this case, what do you base it on? Did you have an opinion based on a bunch of phone calls of what this meant? Yes. What did it mean? I mean, it's very cryptic and mystified for the jury, and it really comes off from a witness who is also an expert witness as we trust him. He knows everything. And so that's the problem that we have, the prejudice problem that we have here. And I just would love your thoughts on that. Well, certainly it would be very nice, obviously, if we had that kind of very explicit description of the basis with respect to, you know, why Agent Bevington was testifying as he did. And do you not ever do it that way? Well, I remember this is beforehand. No, no, I mean, but you also have to take Judge Rogers' points about this is a long-developing concern. And just rationally, when I read Rule 701 and think it has to be rationally based on perception, and I know about the jury's role, it doesn't take rocket science to think that it has to be something along those lines. Right. I think, and in this case, you know, we've conceded that there was certainly at least some error under Hampton with respect to Agent Bevington's testimony. Obviously, we can't go back in time and change that testimony. But nevertheless, I do think that if you look carefully at how the prosecutor argued this case, he made the kind of points that you're making right now. He talked about juxtaposing what we know from Morris' testimony about these meetings. Juxtaposing the calls. Looking at who was coming there. You know, he talked about, I think he talked very explicitly about March 21st. But you said in closing. Yes, in closing. Right. So I think this, in other words, the jury was told pretty explicitly with respect to Mr. Williams' transactions, and that's really what we're talking about here. Got a pretty fulsome picture of what the government's case was against Mr. Williams and why it was compelling. Yes, it was certainly circumstantial in that we didn't have, you know, he wasn't out there walking around with cocaine in his hands. This is true. And he wasn't openly talking about cocaine over the phone as none of them ever did. But nevertheless, that there was absolutely a compelling case based on everything that Mr. Bowman was doing that day, his activities and what we know from Mr. Moore about what he'd been providing to Mr. Bowman, that Mr. Williams was one of a number of customers that day who met Tolbert, you know, Minns, East Monteal, Brooks, and others who were meeting sequentially with Mr. Moore. I'm sorry, with Mr. Bowman. Remember, Mr. Bowman also says, you know, he's telling him, I don't want all of you coming at the same time. When you take all of this together and put it in context, you don't need Agent Bevington's testimony. Quite frankly, it's doing exactly what the prosecutor does in summation and what any reasonable juror could come up with. And that's why we think in this case it was, although there was some error under Hampton, it was nevertheless harmless. Why is it harmless if they only convicted him of something between a detectable amount and 500 grand? Right. Well, because I think obviously it wouldn't have been possible. And Agent Bevington, I don't recall ever testifying at any point as to what specific amount Mr. Williams got in this case. The only specific testimony as to amount that was out there was Mr. Moore had talked about some amount that he'd provided. And then there was some testimony from Agent Bevington about how much he, based on words that were used, how much Tolbert got that day. But nevertheless, so at that point, the jury could be pretty confident that Mr. Williams had gotten drugs for resale from Mr. Bowman, but didn't have specific testimony from which to draw a conclusion as to how much that he got. But in this case, I think, again, because the jury was able to make that distinction, focusing on the actual evidence against Mr. Williams, we can be confident that it properly assessed that evidence independently and did so independently of Agent Bevington's testimony. Can you, I just want to be clear about your answer to my prior question. What, if any, guidance did the judge give the jury about how to consider the lay opinion testimony? And again, I have to go back and check the record to see if there was an express instruction given about lay opinion testimony. I will try to find that. I mean, I read through the instructions that you provided in the appendix. Right. So I don't know that there was an express instruction given beyond the expert instruction that was given, in which case the jury was told that he was an expert as to code words. But I don't think that there was a specific instruction. But I have to go back and check. I do apologize. I don't have it right in front of me. As to when he began testifying, whether or not the jury, the judge gave a lay opinion instruction. I do think that the, that obviously it's neither this court nor other courts have really gone to depth into sort of instructions that are given as to lay opinions as opposed to expert opinions. This is definitely what has drawn the most concern as to telling the jury how to treat it. In this case, I think that, you know, again, the, even without such an instruction, I think the jury got the message both through the cross-examination of Agent Bevington and from the government's own closing argument, that it was very clear that Agent Bevington was interpreting the calls. He was trying to look at it, you know, based on the evidence, the same evidence that the jury had. And so the question of what the government was arguing to the jury was that it should, in fact, look at these calls and Mr. Williams' interactions with Mr. Bowen as related to cocaine. If there are no further questions, we respectfully submit that the judgment of the district court should be affirmed. Thank you. Thank you very much. All right. Mr. Greenspun? Yes. A couple brief points, Your Honor. In terms of the questions and concerns about, well, what can we do in these cases, and Agent Bevington was really not testifying, as we understand, he was accusing Williams of discussing cocaine. These were accusations he was making. And if I can take it one step further, if they don't have the evidence, they don't have the evidence. You know, the Gaskins case, and the Gaskins, U.S. v. Gaskins in this circuit, and it cites Ingram, say that a defendant's responsibility in a conspiracy must be proven by his own acts and declarations. They didn't have that in this case. They didn't have it. They didn't bother to investigate and follow up. They had plenty of time. If the government doesn't have the evidence by their own acts and declarations, they don't have it. I don't believe that. I mean, it's going back to a very dark time when you say an agent or a government official can come in and accuse somebody of doing this, and that's it, they're guilty, okay, because the jurors will give that a lot of weight. And the other thing I would like to say is if you cut out Bevington's testimony from this case, I think that Williams is entitled to a judgment of acquittal. He was entitled to it because they didn't prove it, his participation and knowledge in the conspiracy. And I just repeat one last time that because the government's last position was that Bowling could plead, if Williams' plan shows that their objective in cutting 20 years off the guy's sentence was to get a conviction of Williams, to guilt by association, oh, the multiple conspiracy argument. Here's another reason multiple conspiracy is important. Because if you have multiple, you have to be guilty of the conspiracy charge. If you don't prove that, you're not guilty of that conspiracy. The other thing is, without the multiple conspiracy, all the evidence of all the other acts can all come in and be held against the defendant because it's one conspiracy. It's not one conspiracy. Okay? I mean, the jury verdict shows that. And that's all I have to say. Thank you very much for your attention. All right. Counsel, Mr. Lekhar, Mr. Sussman, and Mr. Greenspan, you were appointed by the court to represent appellants in this case or in these cases, and we express our appreciation and thank you for your assistance. Could I just mention, we had asked for if you had a proper jury instruction, and then we were appointed to a footnote in the brief. And that actually is just a reference to the order of the court on the issue. We have the jury instructions as given, but it would be useful to have the jury instruction that was proffered, which I think is in the district court record. But it would be helpful to have your confirmation of the actual, you know, jury instruction that was given. Right. I think it may be in the district court record, but it would just be helpful to have. We don't have it in this record. It would be helpful to have confirmation. Thanks. All right. May I just follow up by saying today is the 11th of March. Could we ask that these responses be submitted to the court by next Friday? Is that too quick to turn around? Sorry, so that's March 18th? Thank you.
judges: Rogers, Pillard, Wilkins